```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

         -v-                                              No.  13 Cr. 254 (LTS)

JOSE ANTONIO TRAD GONZALES,

         Defendant.
-------------------------------------------------------x
```

## MEMORANDUM OPINION AND ORDER

This motion to dismiss an indictment presents the question of what is required to prove that a non-resident of the United States is a fugitive from justice.  Defendant Jose Antonio Trad Gonzales ("Defendant" or "Trad Gonzales"), charged pursuant to 21 U.S.C. § 846 in a one-count Indictment with conspiracy to possess with intent to distribute cocaine, from 2006 to 2007, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), moves to dismiss with prejudice all charges against him, citing 18 U.S.C. § 3282 and arguing that the 2013 indictment filed in this matter was untimely.  Trad Gonzales was arrested on March 28, 2013, as he attempted to re-enter the United States from Mexico.  The Government asserts that Trad Gonzales' indictment is timely because the statute of limitations was tolled pursuant to 18 U.S.C. § 3290 by reason of the Defendant's alleged flight from justice, inferred from his lack of recorded border crossings into the United States from 2007 to 2013.

The Court held an evidentiary hearing on Trad Gonzales' motion on Tuesday, September 10, 2013, and Thursday, September 12, 2013.  Having carefully considered the testimony at the hearing, the parties' initial and supplemental submissions and their arguments, for the following reasons, the Court grants Defendant's motion.  This Memorandum Opinion and Order sets forth the Court's findings of fact for purposes of Federal Rule of Criminal Procedure

12(d) and its conclusions of law.

## FACTUAL BACKGROUND

At the evidentiary hearing, live testimony was provided by three agents: Special Agent Matthew Maguire of the Department of State ("SA Maguire"); Officer Deep Chopra ("Officer Chopra") of the Department of Homeland Security; and Special Agent Lee ("SA Lee") of Homeland Security Investigations, who was the case agent assigned to this case. The Defendant also testified. Through SA Lee, the Government introduced the statement of a cooperating witness concerning Trad Gonzales' alleged participation in the crime charged. The Defense also proffered the testimony of Defendant's sister, Martha Isabel Trad Gonzales, through a sworn affidavit. She placed one of Defendant's last return trips to the United States as occurring in December 2006, as opposed to in or around 2007 or 2009, as the Defendant testified. The Court, having considered carefully the testimony and demeanor of the witnesses and the other evidentiary submissions, finds the essential facts as follows.

Trad Gonzales is a citizen of Mexico and has lived at the same address in Reynosa, Tamaulipas, Mexico since the 1970s. The town of Reynosa borders the state of Texas, and Trad Gonzales' residence is no more than five or six miles from the border crossing. There is a U.S. Consulate in the adjacent town of Matamoros and a Department of Homeland Security ("DHS") Office within the vicinity. Defendant is a former Mexican federal law enforcement agent, a lawyer who has served in a prosecutor's office and, up until the time of his arrest, was an employee of the Public Works Department of his municipality.[1] His name and address are listed with his telephone number, which has remained the same at all relevant times, in the local

---

[1] SA Lee testified that, to the extent he attempted to verify any of this information, including the Defendant's lack of criminal history and employment history, he was able to verify it.

telephone book.

In 2006, Trad Gonzales traveled to the United States with a man whom he knew as Roberto Gonzalez. The Government proffers that the individual is also known as Jose Zumaya ("Zumaya") and that, when Zumaya began cooperating with the Government, he told the Government that he and Trad Gonzales had twice flown from McAllen, Texas, to pick up and deliver drugs and cash for an individual named Johnny Jacob, as part of a larger narcotics conspiracy. After these proffer sessions, in 2007, SA Lee was able to corroborate Zumaya's account of traveling to New York City with Trad Gonzales in August and September 2006, by subpoenaing airline tickets and hotel receipts. The subpoenaed records reflect that Trad Gonzales registered under his own name and real address and provided his telephone number. Trad Gonzales also opened a Bank of America bank account while in the United States at this time. The bank account was opened under the Defendant's own name and his address in Mexico appears in many of the related Bank of America records. The Government proffered no evidence of illegal activity by Trad Gonzales after the two September and August 2006 trips to the United States. Trad Gonzales testified that prior to his own arrest, he learned of Zumaya's arrest and that the charges against Zumaya involved drugs.[2]

According to the United States Consular Consolidated Database records, maintained by the Department of State, Trad Gonzales has had two border crossing cards that incorporated B1/B2 visas, authorizing him to enter and to remain temporarily in the United States. The United States Customs and Border Protection ("CBP") records reflect that Trad

---

[2] Trad Gonzales testified at the hearing that he learned of Zumaya's arrest in November of 2006. (Tr. 221: 4-9.) As Zumaya was not arrested until 2007, the Court assumes that Trad Gonzales was confused about the date. The essential fact is that Trad Gonzales was aware of Zumaya's arrest during the period in which the Government contends that Trad Gonzales was a fugitive from justice.

Gonzales crossed into the United States 18 times in 2002; 41 times in 2003; 10 times in 2004; 17 times in 2005; 19 times in 2006; once (on May 8, 2007) in 2007, and not at all from May 8, 2007 until March 28, 2013, when Trad Gonzales was arrested at a Texas border crossing.  The Government witnesses testified that, to cross the United States/Mexico border by land, each person has to have valid travel documents and that those documents are swiped through computerized machinery.  None of the Government witnesses had served at border crossings in Texas, however, and they had no knowledge of actual practice at the crossings that Trad Gonzales had used.  (see, e.g., Tr. 29:21-25 (SA Maguire A: "I have never been [in the vicinity of McAllen Texas]; Q: Do you know how many border crossings there are there?; A. No, I don't").  They also acknowledged that there is equipment at the border that photographs the license plates of vehicles passing in and out of the United States, but no records of such photographs or details of that aspect of the program were introduced.

      Trad Gonzales testified credibly that his border crossing card became mutilated and was no longer machine-readable in between 2007 and 2009.  The Defendant testified that the card became caught in a car seat and was mutilated and that he discussed the damaged card when he traveled over the border with his daughter Sofia to visit a Harley Davidson store.  In the sworn affidavit from his sister, Martha Trad Gonzales, she testifies that this trip occurred in December 2006, and that her brother's border crossing card was damaged at that time.  This testimony was corroborated by government Exhibit 1, consisting of printouts from CBP's border crossing record system (referred to as "TECS"), which reflects that Trad Gonzales' card was found mutilated during a crossing on December 23, 2006, and that Trad Gonzales was told that he would no longer be able to cross with that card.  Trad Gonzales did not apply to renew the card, which had an expiration date of November 2010, and testified that he continued thereafter

to use it for border crossings until it expired in 2010.  The Defendant also testified credibly that, when his card was no longer machine readable, the border officials entered the information manually or merely made visual verification of the card.  Trad Gonzales also testified credibly that he would cross the border to teach golf at several golf clubs in Texas during these years, and named those golf clubs and the people with whom he worked at the clubs – testimony which was not rebutted by the Government.  Trad Gonzales had no valid visa in 2011 and 2012, and did not apply for a new card until 2013.  He was arrested when he attempted to enter the United States with the new card on March 28, 2013.

        Federal law enforcement officials obtained a warrant for Trad Gonzales' arrest on narcotics charges on the basis of a Complaint on February 25, 2009.  The Government obtained the original indictment in this case charging Trad Gonzales with conspiracy to distribute and possess with intent to distribute cocaine on April 3, 2013.  This indictment was superseded on August 5, 2013, with the only change being that the dates of the alleged conspiracy were expanded from October 2006 to May 2007, to 2006 to 2007.  Despite the fact that they had hotel and bank records listing the same Mexican address for Trad Gonzales since 2007, the government agents investigating the case made no attempt to discern whether Trad Gonzales could be found at that address, either directly or through the Mexican authorities.  SA Lee, the case agent, testified that he chose not to follow up on the address that Trad Gonzales had provided, which included the Defendant's street name and house number, town, country and postal code, because he does not understand Mexican addresses and was "not familiar with how a Mexican address should look" even though he noted that Mexican addresses "seem[ed] to be like set up like you would if there was a U.S. address."  (Tr. 135:3-7.)  SA Lee also testified that, although the people within DHS could have helped interpret the address for him, he did not seek

any assistance from them in interpreting or locating the address from them.  SA Lee further testified that the DHS maintains an office in the vicinity of Trad Gonzales' Mexican residence and that there is an extradition treaty in effect between the United States and Mexico.[3]

Instead, after Zumaya had identified a photograph of the Defendant, SA Lee put a "lookout" alert on Trad Gonzales' immigration file in 2007, so that any attempted reentry into the United States would be flagged when the Defendant's border card was scanned or manually entered into the TECS system.  A "lookout" means, that if Trad Gonzales came into contact with a Customs and Border Protection official at a port of entry, the system would send a computer-generated email to SA Lee.  No such entry was flagged until March 28, 2013, when Trad Gonzales was arrested.  SA Lee testified that, for approximately six years, from 2007 to 2013, he did nothing more than conduct yearly database checks and update the system records to indicate that Trad Gonzales was still at large.

## DISCUSSION

Trad Gonzales is charged under 21 U.S.C. § 846 with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  18 U.S.C. § 3282(a) (LexisNexis 2013) provides that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  The Government concedes that this prosecution is untimely unless statutory tolling is available pursuant to 18 U.S.C. § 3290

---

[3] SA Lee testified that he did not seek extradition because he did not know where Trad Gonzales was, although notes taken by the Assistant United States Attorney during a meeting with SA Lee shortly before the evidentiary hearing on September 6, 2013, attribute to SA Lee a statement that he did not seek extradition because he thought that Trad Gonzales would return to the United States.  SA Lee testified that he did not review the AUSA's notes before the hearing.  (Tr. 148:11-151:7.)

(LexisNexis 2013), which provides that "[n]o statute of limitations shall extend to any person fleeing from justice." According to the Government, Trad Gonzales fled from justice following the May 2007 arrests of Zumaya and Jacobs. The Government argues that the fact that Trad Gonzales was fleeing from justice can be inferred from the CBP records, which show that the Defendant had traveled to and from the United States with great frequency from 2002 to 2006, and then after a May 8, 2007, trip, reflect no border crossings until his arrest on March 28, 2013.

"[T]olling is properly determined by the trial court rather than the jury." United States v. Florez, 447 F.3d 145, 150 (2d Cir. 2007). Statutes of limitations are to be construed liberally in favor of repose. Toussie v. United States, 397 U.S. 114, 116 (1970). Under section 3290, the Government has the burden of proving that the defendant has fled justice by a preponderance of the evidence and a "finding of flight under § 3290 requires proof that the defendant intended to avoid arrest or prosecution." Florez, 447 F.3d at 151. "A person flees from justice when he realizes that there is a high probability that he will be prosecuted for a crime and he hides or absents himself with the intent to frustrate prosecution." United States v. Rivera-Ventura, 72 F.3d 277, 280 (2d Cir. 1995). The concept of flight has been given a "broad interpretation" by the Second Circuit. Id. at 283. A person's intent to flee may be inferred from his "failure to surrender to authorities once he learns that charges against him are pending." United States v. Catino, 735 F.2d 718, 722 (2d Cir. 1984), even if those charges are not formal, as long as the person "[is] aware that a criminal investigation [is] underway." Florez, 447 F.3d at 151 (citation omitted) (holding also that the "nature and the extent of the efforts of government agents to locate the defendant is one factor to consider in determining whether it is reasonable to infer from the agents' failure to locate the defendant that the defendant was acting with the intent to avoid arrest or prosecution").

Flight has been sufficient to toll the statute of limitations where the Government was able to show that the Defendant attempted to flee from justice by engaging in acts of self-concealment like providing authorities with false names and addresses. Rivera-Ventura, 72 F.3d at 284-85 (emphasizing that there is an element of intent involved in fleeing from justice and the defendant must purposefully take himself out of the jurisdiction to avoid being caught). In Florez, the Second Circuit affirmed the trial court's finding, based on the totality of the circumstances, that the defendant had fled from justice when the defendant told several co-workers that his brother was in trouble and the day after his brother's arrest, he left his workplace (where he had been employed for 12 years) and never returned and also asked a friend to use her address for his driver's license and bank account. 447 F.3d at 152-54 (also noting that the government had made "reasonably diligent" efforts to locate the defendant). However, the statute should not be tolled "when a person without such purpose of escaping punishment merely moves openly to another place of residence." Rivera-Ventura, 72 F.3d at 283. Thus, for example, in United States v. Broe, the court granted the defendant's motion to dismiss finding that the charges against her were untimely, even though the defendant knew that she was the target of a U.S. investigation and returned to Denmark, because the "circumstantial evidence . . . [did] not reasonably support the inference that Defendant intended to avoid arrest or prosecution" 695 F. Supp. 2d 1361, 1378 (S.D. Fla. 2010) (adopting report and recommendation) (collecting and distinguishing from other cases where it was found that the defendant had intentionally sought to flee from justice).

In this case, the record is insufficient to support the requisite inference of intent to flee. The Government's entire case for tolling turns on the assertion that Trad Gonzales abruptly ceased entering the United States after Zumaya's arrest in order to evade likely prosecution on

narcotics charges.  The government's premise fails for a number of reasons.  First, the Court credits Trad Gonzales' testimony that he did not, in fact, cease to enter the United States immediately after Zumaya's arrest.  The failure of the "lookout" placed in the TECS system to flag his entries between the latter half of 2007 and November 2010, when he stopped crossing the border because his visa had expired, may have been due to the border agents' failure to enter the card number manually in an accurate fashion, or to enter it at all.  The machine-readability problem with the card, which existed at least from December 2006, could also explain why, despite reflecting 19 entries by Trad Gonzales in 2006, the system shows none by Trad Gonzales in 2007 until the May 8, 2007, entry, and none thereafter, through 2010.

       Furthermore, even if the Court were to reject Trad Gonzales' testimony regarding continued entries into the United States, the remaining evidence is insufficient to demonstrate an intent to evade justice.  Trad Gonzales had entered the United States in 2006 and earlier years under his own name, and purchased airline and hotel services and opened a bank account in his own name on the supposedly drug-related trips.  He had a law-enforcement background, having served as a police officer and as a prosecutor responsible for carrying out arrest warrants and corresponding investigations.  If Trad Gonzales knew that the authorities would likely seek him out, he must have known that they would easily obtain access to the address and contact information he had provided in connection with his United States visa application and the 2006 travel.  Trad Gonzales nonetheless continued to live openly at the same address, and worked openly in the town, including for the municipal government.  Indeed, he lived no more than five or six miles from the border and there was a DHS Office in the vicinity of his residence.

       The proposition that Trad Gonzales would think that simply staying on the Mexican side of the border would suffice to protect himself from United States prosecution for

what is alleged to be a serious, large-scale drug trafficking offense strains credulity. Trad Gonzales had no reason to expect that U.S. government officials would be foolish enough to fail to even try to find him at his house or call him on the accurate telephone numbers that he had provided in connection with his travels. "[A] person's mere absence from a jurisdiction is insufficient, by itself, to demonstrate flight under § 3290 . . .; there must be proof of the person's intent to avoid arrest or prosecution." Florez, 447 F.3d at 151.

Here the Government has demonstrated, at best, that Trad Gonzales, a non-United States resident, returned to his country of residence, stayed there openly at a known address near the United States border and carried on his life in normal fashion after allegedly engaging in criminal activity during brief trips to the United States and learning that a co-conspirator had been arrested. This evidence is woefully insufficient to sustain the Government's burden of proving that Trad Gonzales acted with the intent to flee from justice. Crucially, there is no evidence sufficient to support an inference that Trad Gonzales sought to conceal himself or resist capture. C.f. Florez, 447 F.3d at 151-153. Relief from the statute of limitations pursuant to 18 U.S.C. § 3290 is thus unavailable and the indictment must be dismissed as untimely.

## CONCLUSION

Accordingly, Defendant's motion seeking dismissal of the indictment is granted. This Memorandum Opinion and Order resolves docket entry number 14. Trad Gonzales shall be released from the custody of the United States Marshals Service as of 12:00 p.m. noon on Monday, September 23, 2013.

The Clerk of Court is hereby directed to enter judgment dismissing the

superseding indictment and to close this case.

        SO ORDERED.

Dated: New York, New York
      September 19, 2013

                                                              /S
                                        LAURA TAYLOR SWAIN
                                        United States District Judge